IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | 8:08CR451 |
| Plaintiff, ) | |
| ) | |
| vs. ) | REPORT AND |
| ) | |
| CARLOS ALAMILLA-HERNANDEZ, ) | RECOMMENDATION |
| ) | |
| Defendant. ) | |

      This matter is before the court on the motions to suppress filed by defendant Carlos Alamilla-Hernandez (Alamilla-Hernandez) (Filing Nos. 23 and 29). Alamilla-Hernandez is charged in the Indictment along with John Brian Smith with the possession with intent to distribute more than 500 grams of methamphetamine on November 30, 2008, in violation of Title 21 U.S.C. § 841(a)(1). Alamilla-Hernandez seeks to suppress evidence found after a traffic stop of his vehicle on Interstate 80 in Buffalo County, Nebraska, by the Nebraska State Patrol (NSP) on November 30, 2008, a subsequent search of the vehicle, and any statements he made during subsequent interrogation.

      An evidentiary hearing was held on Alamilla-Hernandez's motions on March 20 and 31, 2009. Alamilla-Hernandez was present for the hearing along with his counsel, Horacio J. Wheelock. The United States was represented by Assistant U.S. Attorney Andrea E. Belgau. During both sessions of the evidentiary hearing, Laura Garcia-Hein, a certified interpreter in the Spanish language, served as interpreter. The court heard the testimony of Special Agent Stacey Slater (Agent Slater) of the Drug Enforcement Administration (DEA) and NSP Trooper Paul Hazard (Trooper Hazard). The court received into evidence the following exhibits: a DEA 13A card (Exhibit 1), a DVD of the traffic stop (Exhibit 2); a report of an interview of Alamilla-Hernandez (Exhibit 3); an e-mail to Andrea Belgau (Exhibit 101); and a page from a Spanish dictionary (Exhibit 102). A transcript of both sessions of the hearing (TR.) was filed on April 9, 2009 (Filing No. 38). The matter was deemed submitted upon filing of the transcript.

## FINDINGS OF FACT

NSP Trooper Hazard was certified as a Nebraska law enforcement officer in 2002 and has been with the NSP since then (TR. 39-40). During his initial training and during ongoing training, Trooper Hazard learned about the rules of the road, Nebraska laws, and drug interdiction tactics (TR. 40). Trooper Hazard also received training and was certified for the use of Doppler radar equipment for tracking the speed of vehicles (TR. 42). Prior to each shift, Trooper Hazard checks the calibration of his radar equipment with certified tuning forks (TR. 42-43). Trooper Hazard again calibrates the equipment at the end of his shift (TR. 43). Trooper Hazard calibrated his radar equipment with the tunning forks on November 30, 2008, before his shift (TR. 43). The equipment passed the calibration tests both before and after the shift (TR. 43). Trooper Hazard was trained and is re-certified each year for visually estimating the speed of vehicles (TR. 43-45).

On November 30, 2008, Trooper Hazard, wearing his uniform and driving a marked patrol cruiser, was assigned to general traffic enforcement on Interstate 80 (TR. 41, 52). The weather was cold and windy with occasional snow flurries (TR. 66-67; Ex. 2). At approximately 11:00 p.m., Trooper Hazard observed a vehicle traveling below the posted speed limit of 75 mph eastbound on I-80. At that time, Trooper Hazard was traveling westbound on I-80 near mile marker 280 at the Minden interchange in Buffalo County, Nebraska (TR. 41). Trooper Hazard activated his radar and clocked the vehicle at 62 mph (TR. 41-42). Although not a violation of the rules of the road, Trooper Hazard continued to watch the vehicle pass him because it continued to decrease speed (TR. 45). Trooper Hazard clocked the vehicle again at 36 mph (TR. 45). Trooper Hazard turned the patrol cruiser around to follow and observe the passenger vehicle (TR. 45). Trooper Hazard wanted to determine if the vehicle was having a problem (TR. 45). After Trooper Hazard caught up to the vehicle, he clocked it at 36 mph again for nearly a quarter of a mile (TR. 45-46). At 11:08 p.m., Trooper Hazard initiated a traffic stop for driving too slowly on the interstate because the minimum legal speed is 40 mph (TR. 46, 52). The traffic stop was audio and video-taped (Ex. 2).

After stopping the vehicle, Trooper Hazard approached on the passenger side (TR. 46). Trooper Hazard informed the occupants the reason for the stop and identified himself

(TR. 46). Trooper Hazard encountered a language barrier with the driver who did not seem to understand the reason for the stop (TR. 48). Trooper Hazard asked for identification (TR. 46). The driver presented a Mexican identification card, a U.S. passport, a vehicle registration, and the passenger's identification (TR. 46). The driver identified himself as Carlos Alamilla-Hernandez and the passenger was identified as John Smith (TR. 47). The vehicle was registered to Smith (TR. 48).

Trooper Hazard asked Alamilla-Hernandez to exit the vehicle and take a seat in the front passenger seat of the patrol cruiser (TR. 49, 71). Alamilla-Hernandez complied (TR. 49). Trooper Hazard then asked Smith about the trip (TR. 49). Smith stated the two men were traveling from California to Indiana (TR. 49). Trooper Hazard returned to his patrol cruiser to speak to Alamilla-Hernandez (TR. 50). Trooper Hazard attempted to explain the reason for the stop, but was having difficulty because of the language barrier (TR. 50). At that time, Trooper Hazard detected the odor of alcohol on Alamilla-Hernandez (TR. 50). Trooper Hazard asked Alamilla-Hernandez about the odor (TR. 50). Alamilla-Hernandez stated he had "one beer," in Spanish, and indicated there was an open container still in the vehicle (TR. 50, 74). Trooper Hazard also asked about the travel plans (TR. 50). Alamilla-Hernandez stated they were traveling from California to Indiana (TR. 50). Alamilla-Hernandez stated he had been in Los Angeles, California, on vacation or to visit family with his boss, Smith (TR. 50, 73).

Trooper Hazard asked Alamilla-Hernandez to get back into the passenger vehicle and to tell Smith to get in the patrol cruiser (TR. 51, 74-75; Ex. 2). Trooper Hazard wanted to investigate the issue of the open container and did not think Alamilla-Hernandez understood him about the reason for the traffic stop (TR. 51). Trooper Hazard assumed Smith could give him more information and explain the traffic stop to Alamilla-Hernandez (TR. 51). Trooper Hazard explained to Smith that Alamilla-Hernandez needed to speed up or he would cause a crash based on the average speed of the other vehicles (TR. 52). Additionally, Trooper Hazard asked about the open container (TR. 52). Smith stated that he had not been drinking, but admitted Alamilla-Hernandez had one beer, which was in the vehicle under the seat (TR. 53).

Trooper Hazard stated he would have to search the vehicle because of the alcohol and asked if he would find anything else in the vehicle (TR. 54). Initially Smith said, "no" (TR. 77). Smith also said, "not that I know of" (TR. 92-93). In Trooper Hazard's experience, that type of statement is an attempt to distance the speaker from contraband in the vehicle (TR. 92-93). Trooper Hazard noticed Smith was overly friendly, anxious, and jittery (TR. 77). Based on this conduct, Trooper Hazard asked Smith if he used any prescription or street drugs (TR. 77, 81). Smith stated he had not used drugs for four years, but had been arrested previously (TR. 79). After this conversation, Trooper Hazard asked Smith how much "crank" was in the car (TR. 79). Smith said there was none that he knew of (TR. 79). Trooper Hazard asked what was in the trunk (TR. 79). Smith said he would give his permission for Trooper Hazard to check and search the vehicle (TR. 79). Smith said there may be marijuana in the vehicle's trunk speakers (TR. 54). Smith stated he believed Alamilla-Hernandez had placed the marijuana in the speakers when Alamilla-Hernandez had taken the vehicle on one occasion in California, where they were visiting Alamilla-Hernandez's family reunion (TR. 55). Smith stated the marijuana was in 15 to 20 bundles and indicated the bundles were softball-sized (TR. 56). Smith stated he was just guessing about the presence of marijuana, but Alamilla-Hernandez had used the speaker to hide marijuana the previous month (Ex. 2). Smith stated he did not speak Spanish (TR. 55). Trooper Hazard found it unusual that the driver and passenger could not communicate with each other (TR. 95).

Trooper Hazard explained to Smith the open container gave him probable cause to search the interior of the vehicle (TR. 56). Smith stated, "you can check the car" and "go ahead and look in it, I don't have anything to hide" (TR. 56). Trooper Hazard asked Alamilla-Hernandez again to exit the passenger vehicle and get in the caged portion, or rear passenger seat, of the patrol cruiser (TR. 56, 83). Trooper Hazard first located an open container under the driver's seat in the vehicle (TR. 57). Next, Trooper Hazard opened the trunk and attempted to find marijuana in the location described by Smith (TR. 57). Trooper Hazard located a speaker which felt as though it concealed an object (TR. 57). Trooper Hazard did not see a way to open it without dismantling the speaker so he returned to speak to Smith (TR. 57). Trooper Hazard had Alamilla-Hernandez return to the

passenger vehicle while Trooper Hazard spoke to Smith (Ex. 2). Smith stated he did not know how to open the speaker, but made more statements to Trooper Hazard about the possibility of drugs in the vehicle (TR. 58; Ex. 2). Alamilla-Hernandez was again asked to return to the patrol cruiser's backseat (Ex. 2). Trooper Hazard resumed the search (Ex. 2). On the backseat of the passenger vehicle, Trooper Hazard found a screwdriver that he used to open the speaker (TR. 58). In the speaker box, Trooper Hazard found two packages, 5.1 pounds, of a substance that field tested positive for methamphetamine (TR. 58-59). Trooper Hazard located the methamphetamine at 11:26 p.m. (Ex. 2). Trooper Hazard immediately placed Smith and Alamilla-Hernandez under arrest (TR. 59).

On December 1, 2008, at 1:00 a.m., Investigator Javins attempted to interview Alamilla-Hernandez (Ex. 3). Although Investigator Javins attempted to advise Alamilla-Hernandez of the Miranda warning, in Spanish, Alamilla-Hernandez stated he did not understand (Ex. 3). Similarly, Alamilla-Hernandez stated he did not understand why he had been arrested (Ex. 3). Based on these statements, Investigator Javins terminated the interview (Ex. 3).

On December 1, 2008, Special Agent Thurmond Windham (Agent Windham) informed Agent Slater that Alamilla-Hernandez had been arrested in Buffalo County by NSP troopers (TR. 5). Agent Slater was informed that Alamilla-Hernandez had been found in possession of five pounds of methamphetamine (TR. 5). NSP troopers tried to speak to Alamilla-Hernandez, but no Spanish-speaking officer was present at the time of the arrest (TR. 5). The NSP requested that Agents Slater and Windham travel to the jail to speak to Alamilla-Hernandez, in Spanish, to determine if he was willing to speak to law enforcement (TR. 5-6). The agents arrived at the jail at approximately 2:00 p.m. (TR. 6).

Agent Slater is a Special Agent with the DEA (TR. 4). Prior to an assignment in Bogata, Columbia, Agent Slater attended a six-month language training course to learn the Spanish language (TR. 4). Agent Slater worked in Bogata for two years (TR. 5). Agent Slater considers himself to have a working knowledge of the written and spoken Spanish language, but is not fluent (TR. 4). Agent Slater is currently stationed in North Platte, Nebraska (TR. 6).

Agents Slater and Windham met with Alamilla-Hernandez in a small room at the jail (TR. 6). Agent Slater introduced himself and Agent Windham to Alamilla-Hernandez and revealed his credentials to Alamilla-Hernandez (TR. 7). Agent Slater spoke a different dialect of Spanish than Alamilla-Hernandez, however they were able to understand each other (TR. 7). Agent Slater specifically asked Alamilla-Hernandez if Alamilla-Hernandez could understand Agent Slater's Spanish (TR. 7). Alamilla-Hernandez affirmed that he understood (TR. 7). Agent Slater asked permission of Alamilla-Hernandez to inform him of the *Miranda* warning (TR. 8). Alamilla-Hernandez stated he understood and agreed to have the warning read to him (TR. 8).

Agent Slater read the warning from his DEA 13A card, which has the warning printed in English on one side and in Spanish on the other side (TR. 8). Agent Slater testified the Spanish version reflects the same warnings as stated in English on the card (TR. 9). Agent Slater read to Alamilla-Hernandez the Spanish version of the warning, verbatim, from the card (TR. 9). Agent Slater read each of the four sentences from the card one at a time, pausing between each sentence to ask Alamilla-Hernandez if he understood (TR. 9). Agent Slater waited and Alamilla-Hernandez responded "yes" to each question about whether he understood (TR. 9). At the completion of the warning, Alamilla-Hernandez stated he could not afford an attorney (TR. 10). Agent Slater re-read the sentence from the DEA 13A card that states an attorney may be appointed before any interview if someone cannot afford an attorney (TR. 10, 33). Agent Slater then again asked Alamilla-Hernandez if he understood (TR. 10). Alamilla-Hernandez said he understood (TR. 10). Agent Slater told Alamilla-Hernandez that he (Agent Slater) had some questions and asked Alamilla-Hernandez if he (Alamilla-Hernandez) was willing to answer the questions (TR. 11). Alamilla-Hernandez stated he was willing to answer the questions (TR. 11). Agent Slater did not present a written waiver form, in Spanish, to Alamilla-Hernandez because Agent Slater was told by another officer that Alamilla-Hernandez could not read Spanish (TR. 11). Agent Slater informed Alamilla-Hernandez that he could stop the interview at any time and could refuse to answer any specific question he did not want to answer (TR. 11). Agent Slater asked Alamilla-Hernandez if he understood and Alamilla-Hernandez said "sí" or "yes" (TR. 12).

Agent Slater asked Alamilla-Hernandez questions about his arrest, his relationship to the co-defendant, and his possession of methamphetamine (TR. 13-17). Alamilla-Hernandez answered all of the questions. At no time during the interview did Alamilla-Hernandez tell Agent Slater that he did not understand what Agent Slater was saying (TR. 22). Agent Slater did not try to speak to Alamilla-Hernandez in English (TR. 25). On a few occasions, Alamilla-Hernandez used the English term "okay," but spoke no other English (TR. 25). The interview lasted approximately forty-five minutes (TR. 17).

## LEGAL ANALYSIS

### A. Traffic Stop

The Fourth Amendment protects against unreasonable searches and seizures. U.S. Const. amend. IV. "A traffic stop constitutes a seizure under the Fourth Amendment." *United States v. Peralez*, 526 F.3d 1115, 1119 (8th Cir. 2008). "A traffic stop is reasonable under the Fourth Amendment if it is supported by either probable cause or an articulable and reasonable suspicion that a traffic violation has occurred." *United States v. Herrera-Gonzalez*, 474 F.3d 1105, 1109 (8th Cir. 2007) (internal quotation omitted). A law enforcement officer's observation of a traffic violation provides probable cause to stop a vehicle. *United States v. Long*, 532 F.3d 791, 795 (8th Cir. 2008) (**citing** *Pennsylvania v. Mimms*, 434 U.S. 106, 109 (1977)); **see** *United States v. Walker*, 555 F.3d 716, 720 (8th Cir. 2009). An "objective reasonableness" standard is applied to determine whether a traffic stop was based on probable cause. *United States v. Jones*, 275 F.3d 673, 680 (8th Cir. 2001). "An officer is justified in stopping a motorist when the officer objectively has a reasonable basis for believing that the driver has breached a traffic law." *United States v. Mallari*, 334 F.3d 765, 766-67 (8th Cir. 2003). In contrast, "[e]ven if the officer was mistaken in concluding that a traffic violation occurred, the stop does not violate the Fourth Amendment if the mistake was an 'objectively reasonable one.'" *Herrera-Gonzalez*, 474 F.3d at 1109. "[T]he determination of objective reasonableness is not to be made with the vision of hindsight, but instead by looking to what the officer reasonably knew at the time." *Id.* (internal quotation omitted). In any event, the burden

remains on the government "to prove that there was an objective basis for the stop." *United States v. Andrews*, 465 F.3d 346, 347 (8th Cir. 2006) (per curiam).

Trooper Hazard stated the reason for the traffic stop was the slow speed of the passenger vehicle. Under Nebraska law: "No person shall drive a motor vehicle at such a slow speed as to impede the normal and reasonable movement of traffic except when reduced speed is necessary for safe operation or in compliance with law." Neb. Rev. Stat. § 60-6,193(1). More specifically, "On a freeway no motor vehicle, except emergency vehicles, shall be operated at a speed of less than forty miles per hour. . ." Neb. Rev. Stat. § 60-6,193(2). The undisputed evidence before the court shows the vehicle driven by Alamilla-Hernandez was traveling at a speed less than the minimum required by Nebraska law. Although, the passenger vehicle was driving within an acceptable range when Trooper Hazard first observed it, the unusually slow speed of the vehicle caught Trooper Hazard's attention. Trooper Hazard continued to observe the vehicle; he used his radar to determine the exact speed for a sustained time period was below the minimum required by Nebraska law. The weather conditions did not justify the slow speed of the vehicle or lessen the reasonableness of the traffic stop. Trooper Hazard observed the vehicle traveling below the posted minimum speed limit and initiated the traffic stop based on his reasonable belief the vehicle was in violation of the speed requirements of Nebraska law. He had further concern about the condition of the driver. Based on Trooper Hazard's observation, he had probable cause to stop the vehicle.

**B.   Detention**

The defendant argues his detention, from the first time he was placed in the patrol cruiser until the time he was taken to jail, was without legal justification and was unreasonably long. Specifically, the defendant contends he was unable to communicate with law enforcement. Additionally, the defendant asserts the length of the detention was unreasonable in comparison to the violations for speed and an open container.

Contemporaneous with a valid traffic stop, "the officer [is] entitled to conduct an investigation reasonably related in scope to the circumstances that initially prompted the stop." *Untied States v. Lyons*, 486 F.3d 367, 371 (8th Cir. 2007) (**quoting *United States***

*v. McCoy*, 200 F.3d 582, 584 (8th Cir. 2000) (per curiam)). In fact, a police officer may detain the occupants while completing a number of routine tasks such as computerized checks of the vehicle registration, driver's license and criminal history; and issuing a citation. *United States v. Peralez*, 526 F.3d 1115, 1119 (8th Cir. 2008); **see also** *United States v. Sokolow*, 490 U.S. 1, 7 (1989). Additionally, the police officer may inquire about the driver and other occupant's destination, purpose of the trip and whether the police officer may search the vehicle. *Peralez*, 526 F.3d at 1119; *United States v. Gill*, 513 F.3d 836, 845 (8th Cir. 2008).

"If the responses of the detainee and the circumstances give rise to suspicions unrelated to the traffic offense, an officer may broaden his inquiry to satisfy those suspicions." *United States v. Ward*, 484 F.3d 1059, 1061 (8th Cir. 2007) (**quoting** *United States v. Johnson*, 58 F.3d 356, 357 (8th Cir. 1995)). Specifically, an officer may take further action as necessitated by the information volunteered by the motorist, observations of the contents of the vehicle, perceptions made by the police officer regarding illegal drug use, and divergent information from the passengers. *United States v. $404,905.00*,182 F.3d 296, 647 (8th Cir. 1999). In any event, the scope and length of any investigation must be reasonable. *United States v. Chavez Loya*, 528 F.3d 546, 553 (8th Cir. 2008). "The investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *United States v. Ward*, 484 F.3d 1059, 1062 (8th Cir. 2007) (**quoting** *United States v. Bloomfield*, 40 F.3d 910, 916 (8th Cir.1994) (en banc)).

The court finds the length of the stop was directly related to Trooper Hazard's performance of routine tasks associated with the reason for the traffic stop. Furthermore, immediately upon making personal contact with Alamilla-Hernandez, Trooper Hazard identified the odor of alcohol emanating from Alamilla-Hernandez. The court credits Trooper Hazard's testimony about smelling alcohol on Alamilla-Hernandez. Additionally, Smith's statements and Alamilla-Hernandez's own statements corroborated the trooper's observation. Alamilla-Hernandez admitted to drinking one beer and stated the container was in the vehicle. Due to the language barrier between Trooper Hazard and Alamilla-Hernandez, Trooper Hazard then attempted to confirm this information with Smith. Not

only did Smith confirm the vehicle had an open container of alcohol, Smith admitted his own suspicioun there was other contraband in the vehicle's trunk. Accordingly, Trooper Hazard immediately became suspicious of criminal activity tangential to the purpose of the traffic stop that permissibly expanded the scope of the stop. Any unusual delay of the detention was caused by the language barrier between Trooper Hazard and Alamilla-Hernandez or the difficulty Trooper Hazard had conducting a search of the speaker. The court finds the length of any detention was reasonable from the initial traffic stop at 11:08 p.m. until 11:26 p.m., when Trooper Hazard uncovered the methamphetamine in the location where Smith had indicated.

"Police may search a car without a warrant if they have probable cause to believe that the car contains contraband or evidence." *United States v. Neumann*, 183 F.3d 753, 756 (8th Cir. 1999). Trooper Hazard detected the odor of alcohol on the driver and had information the vehicle may contain other contraband. Trooper Hazard's reasonable belief that evidence of crime existed in the vehicle justifies the search of the passenger vehicle. **See, e.g.,** *Arizona v. Gant*, 129 S. Ct. 1710, 1719 (2009). Based on the detection of alcohol and the admission regarding other contraband, the court finds Trooper Hazard had probable cause to conduct a warrantless search of the vehicle. In the alternative, the registered owner of the vehicle granted consent for the search. For the reasons stated above, Alamilla-Hernandez's motion to suppress evidence stemming from the stop and detention should be denied in its entirety.

**C.    Statements**

The court must next examine whether Alamilla-Hernandez's statements were knowingly and voluntarily made. The defendant contends the December 1, 2008, statements were not voluntarily made because the defendant failed to understand he had the right to representation by an attorney at no cost. In the alternative, the defendant argues he attempted to invoke his right to counsel when he stated he could not afford an attorney.

### 1.   Voluntariness

The Self-Incrimination Clause provides: "No person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. "[T]he core protection afforded by the Self-Incrimination Clause is a prohibition on compelling a criminal defendant to testify against himself at trial." *United States v. Patane*, 542 U.S. 630, 637 (2004).

> [I]n *Miranda*, the Court concluded that the possibility of coercion inherent in custodial interrogations unacceptably raises the risk that a suspect's privilege against self-incrimination might be violated. To protect against this danger, the *Miranda* rule creates a presumption of coercion, in the absence of specific warnings, that is generally irrebuttable for purposes of the prosecution's case in chief.

*Patane*, 542 U.S. at 639 (**citing** *United States v. Dickerson*, 530 U.S. 428, 434-35 (2000); *Miranda v. Arizona*, 384 U.S. 436, 467 (1966)).

There is no dispute the defendant was both in custody and being interrogated for purposes of the *Miranda* requirement. **See** *United States v. Londondio*, 420 F.3d 777, 783 (8th Cir. 2005). The touchstone for the admissibility of a defendant's statements is voluntariness. *Brown v. Mississippi*, 297 U.S. 278, 279 (1936). The court must look to the totality of circumstances in determining whether the statements were voluntary. *Mincey v. Arizona*, 437 U.S. 385, 401 (1978); *Colorado v. Connelly*, 479 U.S. 157 (1986); *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973). In this case, the defendant was advised of his constitutional rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). Additionally, there is no dispute Agent Slater advised the defendant of the *Miranda* warnings, in Spanish.

Even though the defendant was advised of his *Miranda* rights, the court must examine the conduct of the law enforcement officials to determine whether there was an overreaching by law enforcement officials amounting to coercive police activity. Coercive police conduct will render a confession inadmissible. *Blackburn v. Alabama*, 361 U.S. 199 (1960). In determining whether a defendant made statements voluntarily, the court must determine if the accused was coerced or his will was overborne and his capacity for self-determination critically impaired. *United States v. Santos-Garcia*, 313 F.3d 1073,

11

1079 (8th Cir. 2002). There is no evidence the defendant did not understand the advice of rights. There is evidence he was alert and coherent. Agent Slater asked the defendant several times if he understood Agent Slater. Alamilla-Hernandez stated he did understand. Additionally, Agent Slater told Alamilla-Hernandez that he could stop the interview at any time and could refuse to answer any specific question he did not want to answer. Under the circumstances, the court finds Alamilla-Hernandez's statements were voluntarily made.

### 2. Fifth Amendment

Once a defendant expresses his desire to have counsel present, he is not subject to further interrogation by law enforcement until counsel has been made available to him unless the defendant himself initiates further communication, exchanges, or conversation with the law enforcement officers. *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981). The burden remains upon the prosecution to demonstrate a waiver of an accused's right to have counsel present after an initial invocation of counsel. *Oregon v. Bradshaw*, 462 U.S. 1039, 1044 (1983). However, a suspect must clearly and unambiguously request a lawyer in order to trigger his Fifth Amendment right to counsel. *Davis v. United States*, 512 U.S. 452, 462 (1994) (holding "Maybe I should talk to a lawyer" is insufficient to trigger Fifth Amendment right to counsel); *United States v. Kelly*, 329 F.3d 624, 630 (8th Cir. 2003) (holding the defendant's question "do you know any good attorneys" was not an unequivocal request for assistance of counsel); **see also** *Dormire v. Wilkinson*, 249 F.3d 801, 805 (8th Cir. 2001) (holding the statement, "[c]ould I call my lawyer?" insufficient to invoke the right to counsel and mandate the termination of questioning).

> The right to counsel recognized in *Miranda* is sufficiently important to suspects in criminal investigations, we have held, that it "requir[es] the special protection of the knowing and intelligent waiver standard." If the suspect effectively waives his right to counsel after receiving the *Miranda* warnings, law enforcement officers are free to question him. But if a suspect requests counsel at any time during the interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation. This "second layer of prophylaxis for the *Miranda* right to counsel," is "designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights." To that end,

> we have held that a suspect who has invoked the right to counsel cannot be questioned regarding any offense unless an attorney is actually present.

*Davis*, 512 U.S. at 458 (internal citations omitted).

Determination of whether an accused has actually invoked right to counsel is an objective inquiry. *Davis*, 512 U.S. at 459. "[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer *in light of the circumstances* would have understood only that the suspect *might be invoking* the right to counsel, our precedents do not require the cessation of questioning." *Id.* (emphasis added).

Furthermore,

> "[F]ull comprehension of the rights to remain silent and request an attorney [is] sufficient to dispel whatever coercion is inherent in the interrogation process." A suspect who knowingly and voluntarily waives his right to counsel after having that right explained to him has indicated his willingness to deal with the police unassisted. Although *Edwards* provides an additional protection--if a suspect subsequently requests an attorney, questioning must cease--it is one that must be affirmatively invoked by the suspect.

*Id.* at 460-61. The Court in *Davis* did not, however, go so far as to require law enforcement officers to ask clarifying questions if the suspect's reference to counsel is ambiguous or equivocal. *Id.* at 461-62.

Alamilla-Hernandez stated he could not afford an attorney (TR. 10). Agent Slater read again the sentence from the DEA 13A card that states an attorney may be appointed before any interview if someone cannot afford an attorney (TR. 10, 33). Agent Slater then again asked Alamilla-Hernandez if he understood what had been read to him (TR. 10). Alamilla-Hernandez said he understood (TR. 10).

Alamilla-Hernandez's statement that he could not afford an attorney may appear to be an invocation of the right to counsel. However, after the statement Agent Slater again advised Alamilla-Hernandez of his right to appointment of counsel by reading directly from the rights advisory card. Afterward, Alamilla-Hernandez stated he understood his rights. Further, Alamilla-Hernandez agreed to answer questions after being told he could stop the interview at any time and could refuse to answer any specific question he did not want to

answer.  The subsequent explanation and advice of rights is equivalent to an attempt to clarify Alamilla-Hernandez's earlier statement.  Furthermore, Agent Slater's administration of the *Miranda* warnings can hardly be characterized as the type of "badgering" a witness into waiving any previously asserted *Miranda* right that the Supreme Court precedent seeks to curtail.  See *Davis*, 512 U.S. at 458.  Also, Alamilla-Hernandez stated he understood his rights, including the right to counsel and to have counsel present for questioning, prior to making any incriminating statements to the agents.  Alamilla-Hernandez did not clearly and unambiguously invoke his right to counsel.  Accordingly, the court finds Alamilla-Hernandez did not invoke his right to counsel, but gave knowing and voluntary statements to Agent Slater on December 1, 2008.  For the reasons stated above, Alamilla-Hernandez's motion to suppress statements should be denied.  Upon consideration,

**IT IS RECOMMENDED TO CHIEF JUDGE JOSEPH F. BATAILLON that:**

Alamilla-Hernandez's motions to suppress (Filing Nos. 23 and 29) be denied.

**ADMONITION**

Pursuant to NECrimR 57.3 any objection to this Report and Recommendation shall be filed with the Clerk of the Court within ten (10) business days after being served with a copy of this Report and Recommendation.  Failure to timely object may constitute a waiver of any objection.  The brief in support of any objection shall be filed at the time of filing such objection.  Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

DATED this 20th day of May, 2009.

BY THE COURT:

s/ Thomas D. Thalken
United States Magistrate Judge