IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | 8:08CR451 |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | MEMORANDUM AND ORDER |
| CARLOS ALAMILLA-HERNANDEZ, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

This matter is before the court on the defendant's objections, Filing No. 42, to the report and recommendation ("R&R") of the magistrate judge, Filing No. 39, denying the defendant's motion to suppress evidence, Filing No. 23, and motion to suppress statements, Filing No. 29. The defendant is charged with possession with intent to distribute more than 500 grams of methamphetamine in violation of Title 21 U.S.C. § 841(a)(1). Filing No. 1, Indictment.

Under 28 U.S.C. § 636(b)(1)(c), the court makes a de novo determination of those portions of the report and recommendation to which the parties object. *United States v. Lothridge*, 324 F. 3d 599, 600-01 (8th Cir. 2003). The court has conducted a de novo review of the record and exhibits, including the transcript of the suppression hearing, Filing No. 38 ("Tr."). The court generally agrees with the magistrate judge's recitation of the facts, but finds error in the magistrate judge's application of the law to the facts. The court will adopt the magistrate judge's recommendation to deny the defendant's motion to suppress evidence, but sustains the defendant's objection to the magistrate judge's recommendation to deny the defendant's motion to suppress statements.

**BACKGROUND**

The facts set forth in the magistrate judge's R&R need not be repeated in their entirety. The court will summarize those facts that are relevant to its decision. The evidence adduced at the evidentiary hearing conducted by the magistrate judge establishes that on November 30, 2008, at approximately 11:00 p.m., Trooper Paul Hazard ("Trooper Hazard") observed a vehicle traveling below the posted speed limit of 75 mph on I-80. Tr. at 41. Trooper Hazard activated his radar and clocked the vehicle at 62 mph. Tr. at 41-42. Trooper Hazard continued to observe the vehicle as it passed him, and clocked the vehicle again at 36 mph. Tr. at 45. He began to follow the vehicle, to determine if a problem existed, and he clocked it a third time at 36 mph for nearly a quarter of a mile. Tr. at 45-46. Trooper Hazard then stopped the vehicle for driving 36 mph because the minimum legal speed on the interstate is 40 mph. Tr. at 36, 52.

Trooper Hazard explained the reason for the stop and identified himself. Tr. at 46. Trooper Hazard testified that there was a language barrier between himself and the driver, who did not seem to understand the reason for the stop. Tr. at 48. Trooper Hazard asked for identification, and the driver handed him a Mexican identification card, a U.S. passport, a vehicle registration, and the passenger's identification. The driver identified himself as Carlos Alamilla-Hernandez ("Alamilla-Hernandez"). Tr. at 47. Trooper Hazard identified the passenger and registered owner of the vehicle as John Smith ("Smith"). Tr. at 47-48.

Trooper Hazard asked Alamilla-Hernandez to go sit in the front passenger seat of the patrol cruiser, and he did. Tr. at 49, 71. Then, Trooper Hazard asked Smith where he and Alamilla-Hernandez were going, and Smith stated they were driving from California to Indiana. Tr. at 50. Trooper Hazard returned to the patrol cruiser to talk to Alamilla-

Hernandez, but had difficulty doing so because of the language barrier. Tr. at 50. Trooper Hazard smelled alcohol on Alamilla-Hernandez so he inquired about it. Tr. at 50. Alamilla-Hernandez stated in Spanish that he had "one beer" and indicated there was an open container in the vehicle. Tr. at 50, 74. Alamilla-Hernandez also stated he had been in California on vacation with Smith, his boss. Tr. at 50, 73.

Trooper Hazard asked Alamilla-Hernandez to return to the vehicle and tell Smith to come sit in the patrol cruiser. Tr. at 51, 74-75. Trooper Hazard asked Smith about the open container, and Smith stated that Alamilla-Hernandez had one beer, which was in the vehicle under the seat. Tr. at 52-53. Trooper Hazard stated he needed to search the vehicle due to the alcohol and asked whether he would find anything else in the vehicle. Tr. at 54. Smith responded by saying, "not that I know of." Tr. at 92-93. Trooper Hazard asked Smith what was in the trunk. Tr. at 79. Smith then gave Trooper Hazard permission to search the vehicle and told him that Alamilla-Hernandez may have hid marijuana in a speaker. Tr. at 54-55, 79. Smith told Trooper Hazard that he was just guessing about the presence of marijuana, but that Alamilla-Hernandez had previously used the speaker to conceal marijuana. Exhibit 2.

Trooper Hazard explained to Smith that the open container gave him probable cause to search the vehicle. Tr. at 56. Smith responded, "you can check the car," and "go ahead and look in it, I don't have anything to hide." Tr. at 56. During his search, Trooper Hazard found an open container under the driver's seat. Tr. at 57. Next, Trooper Hazard opened the trunk and located a speaker. Tr. at 57. Trooper Hazard began searching the vehicle again, found a screw driver on the backseat, and used it to open the speaker. In the speaker box, he found two packages, 5.1 pounds, of a substance that field tested

positive for methamphetamine. Tr. at 58-59. Trooper Hazard immediately arrested Alamilla-Hernandez and Smith and took them to jail. Tr. at 59. The record does not reflect that Trooper Hazard read Alamilla-Hernandez and Smith their *Miranda* rights upon arresting them.

At the time of the arrest, Nebraska State Patrol ("NSP") troopers were unable to speak with Alamilla-Hernandez because no Spanish-speaking officer was present. Tr. at 5. The next day, NSP officers asked Special Agent Stacey Slater ("Agent Slater") to come to the jail and talk to Alamilla-Hernandez, in Spanish, about whether he would speak with law enforcement. Tr. at 5-6. Agent Slater, a Special Agent with the Drug Enforcement Agency ("DEA"), had completed a six-month Spanish language training course and had worked in Columbia, South America, for two years. Tr. at 4. He testified that he is not fluent in Spanish, but he has a working knowledge of the language. Tr. at 4. Before meeting Alamilla-Hernandez, another officer told Agent Slater that Alamilla-Hernandez was arrested in possession of five pounds of methamphetamine. Tr. at 5.

That afternoon, around 2:00 p.m., Agent Slater arrived at the jail, where he and another agent met with Alamilla-Hernandez in a small room. Tr. at 6. Agent Slater introduced himself to Alamillia-Hernandez. Tr. at 7. Then Agent Slater asked Alamilla-Hernandez if he understood who Agent Slater was, and Alamilla-Hernandez indicated that he did. Tr. at 8. Agent Slater testified that he and Alamilla-Hernandez spoke different dialects of Spanish, but that they were able to communicate. Tr. at 7. Next, Agent Slater asked Alamilla-Hernandez, in Spanish, if Agent Slater could read Alamilla-Hernandez his *Miranda* rights, and Alamilla-Hernandez said yes. Tr. at 8. Agent Slater removed a DEA 13A card from his wallet, which has the *Miranda* warnings printed in Spanish on one side

4

and English on the other side. Tr. at 8. Agent Slater testified that he read verbatim from the Spanish side of the DEA 13A card, and explained:

> The Miranda– they're in like four different sentences and so what I did was I read each sentence beginning with the first sentence. After reading that sentence I asked Carlos if he understood. He stated yes. Then I went to the second sentence, read that sentence. After reading that sentence I asked him if he understood, and did that with each of the four sentences that comprise the Miranda warnings.

Tr. at 9.

The third sentence of DEA 13A card states, in English, "You have the right to talk to a lawyer for advice before we ask you any questions and to have a lawyer with you during questioning." Ex. 1. The fourth sentence states, "If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish." Ex. 1.

Agent Slater testified that after reading the Spanish translation of the fourth sentence quoted above, Alamilla-Hernandez replied in Spanish that he could not afford an attorney. Tr. at 10. After Alamilla-Hernandez made that statement, Agent Slater did not ask Alamilla-Hernandez if he wanted a lawyer. Tr. at 31, 35. Instead, Agent Slater reread the fourth sentence to the defendant. Tr. at 10. When asked what he thought Alamilla-Hernandez meant when he said he could not afford an attorney, Agent Slater testified, "Simply that he didn't have the money to afford an attorney to represent him." Tr. at 32. Agent Slater testified, "I went back and read him again the sentence in the *Miranda* warnings that talks about if someone cannot afford an attorney one would be appointed for them." Tr. at 10. Slater then asked Alamilla-Hernandez if he understood and Alamilla-Hernandez responded that he did. Tr. at 10. Agent Slater testified that he did not interpret Alamilla-Hernandez's statement that he could not afford an attorney as a request for an

attorney. Tr. at 30. When asked why he decided to repeat the fourth sentence once Alamilla-Hernandez said he could not afford an attorney, Agent Slater explained:

> When he said he couldn't afford one, then as part of the Miranda I wanted to advise him that if he couldn't afford an attorney, one would be appointed for him.

Tr. at 34.

After Alamilla-Hernandez indicated he understood the fourth sentence of the *Miranda* warnings, on its second reading, Agent Slater asked Alamilla-Hernandez if he would answer some questions, and he agreed to do so. Tr. at 11. Agent Slater did not tell Alamilla-Hernandez that a lawyer would not be present, and did not ask Alamilla-Hernandez if he wanted a lawyer, even though Alamilla-Hernandez had just told Agent Slater that he could not afford a lawyer. Tr. at 10. Agent Slater testified that he told Alamilla-Hernandez that he did not have to answer any questions that he did not want to answer. Tr. at 11. Next, Agent Slater asked Alamilla-Hernandez again if he understood and Alamilla-Hernandez said he did. Tr. at 12.

Then, Agent Slater proceeded to interview Alamilla-Hernandez. Tr. at 11. When asked if Alamilla-Hernandez seemed to be "tracking" him, Agent Slater stated:

> Yes, he seemed to be. He was answering the questions that I was asking. At no time during the time that we spoke did he tell me that he couldn't understand what I was saying.

Tr. at 22.

Agent Slater asked Alamilla-Hernandez about his arrest, his relationship to the co-defendant, and his possession of methamphetamine. Tr. at 13-17. Agent Slater used no English when interviewing Alamilla-Hernandez other than occasionally using the word, "okay." Tr. at 17. The interview lasted for a period of about forty-five minutes. Tr. at 17.

6

The interview was not transcribed and there is no recording of the interview because of a computer malfunction. Tr. at 20. Agent Slater testified that he normally records the *Miranda* warnings. Tr. at 20. Agent Slater said he used a micro recorder, but, when "trying to download it onto the computer, I wasn't able to do so, and lost the file." Tr. at 20. Agent Slater made no attempt to determine if the recording could be recovered. Tr. at 20.

Agent Slater also testified that he ordinarily provides a written *Miranda* waiver in English and in Spanish for individuals to sign. Tr. at 11. He did not do so in this case because "one of the state troopers" told him that Alamilla-Hernandez "didn't read, or couldn't read." Tr. at 11, 21. He never asked Alamilla-Hernandez about his ability to read or write. Tr. at 22.

## MOTION TO SUPPRESS EVIDENCE

The defendant argues that the magistrate judge erred in recommending the denial of the defendant's motion to suppress evidence. Regarding the traffic stop, the defendant contends he was seized within the meaning of the Fourth Amendment, without reasonable suspicion, and without probable cause. He also argues that Trooper Hazard conducted a search of the vehicle incident-to-arrest without probable cause.

The court has carefully reviewed the record and exhibits, including the transcript of the suppression hearing. The court agrees with the magistrate judge's finding that Trooper Hazard had probable cause to stop the defendant on the interstate and conduct a warrantless search of the vehicle. R&R at 8, 10. The court denies the defendant's objections 1-10, and adopts the magistrate judge's recommendation to deny the defendant's motion to suppress evidence produced from the traffic stop and detention.

**MOTION TO SUPPRESS STATEMENTS**

In his motion to suppress the statements made to Agent Slater at the jail, the defendant objects to the magistrate judge's finding that the defendant knowingly, intelligently and voluntarily waived his *Miranda* rights. He argues that he invoked his right to counsel when he told Agent Slater he could not afford an attorney. R&R at 10. The magistrate judge found that Alamilla-Hernandez's statement that he could not afford an attorney was not a clear and unambiguous invocation of his right to counsel. R&R at 14. The magistrate judge found that Agent Slater's "subsequent explanation and advice of rights" to the defendant was equivalent to an attempt to clarify the meaning of the defendant's statement that he could not afford an attorney. R&R at 14. He found that the defendant gave knowing and voluntary statements during the interview on December 1, 2008. R&R at 14.

**A. Law**

*Miranda* warnings must be given any time a suspect is in custody and is subject to interrogation by law enforcement officials. See *Miranda v Arizona*, 384 U.S. 436, 484 (1996). *Miranda* protects the constitutional privilege against self-incrimination by creating a presumption of coercion, and thus inadmissability, for statements made during custodial interrogations in the absence of warnings. *United States v. Patane*, 542 U.S. 630 (2004). Once a defendant expresses his desire to have counsel present, he is not subject to further interrogation by law enforcement until counsel has been made available to him. *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981). When an accused has invoked his right to have counsel present during a custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. *Id*.

Only a clear and unequivocal request for assistance of counsel may serve to invoke defendant's right to counsel. *Davis v. United States,* 512 U.S. 452, 462 (1994). If the suspect invokes that right at any time, the police must immediately cease questioning him until an attorney is present. *Edwards v. Arizona,* 451 U.S. 477 (1981). This is an objective inquiry, requiring some statement that can reasonably be construed to be an expression of a desire for an attorney's assistance. *Davis v. United States,* 512 U.S. 452, 462 (1994). If a reference is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, *Edwards* does not require that officers stop questioning the suspect. *Id.* (emphasis added).

Whenever an interrogator uses a tactic that is deliberately designed to circumvent *Miranda*, the statement must be suppressed. *Missouri v. Seibert,* 542 U.S. 600 (2004). The government must prove, by a preponderance of the evidence that, under the particular facts and circumstances of the case, a waiver of *Miranda* rights is an intentional, voluntary, knowing, and intelligent relinquishment or abandonment of a known right or privilege. *Id*. The burden is on the prosecution to demonstrate a waiver of an accused's right to have counsel present after an initial invocation of counsel. *Oregon v. Bradshaw,* 462 U.S. 1039, 1044 (1983).

**B.  Analysis**

It is not disputed that the interview of Alamilla-Hernandez was a custodial interrogation. The record shows that Agent Slater read Alamilla-Hernandez his *Miranda* rights, in Spanish, from a DEA 13A card. After Agent Slater read Alamilla-Hernandez the Spanish translation of the fourth sentence on the DEA 13A card, which states, "If you

9

cannot afford a lawyer, one will be appointed for you before any questioning if you wish," Alamilla-Hernandez immediately told Agent Slater that he cannot afford an attorney.

The court finds that under the circumstances presented in this case, the defendant made a clear and unambiguous request for a lawyer when he responded, "I cannot afford an attorney" to the officer's statement that if he could not afford an attorney, one would be appointed for him. A reasonable defendant, in this case, could understand the fourth sentence on the DEA 13A card to mean that "if" the condition described in the first clause of the sentence occurs or is satisfied, then the result described in the second clause will happen. Notably, the fourth sentence uses the phrase "will be appointed," and implies that the action described in the second clause will automatically occur, once the condition set forth in the first clause is satisfied. If the condition of not being able to "afford a lawyer" is met, it is reasonable to expect the result, which is a lawyer being appointed, to occur.

The sentence is a classic "If . . . then" proposition, containing a condition and a consequence. For example, consider telling someone: "If you are hungry, lunch will be provided for you." If that person reacted to the statement by saying, "I am hungry," it would be unreasonable to find that he or she responded in that way for no other reason than to let you know he or she is hungry, and not because he or she wants lunch. It would also make little sense for the questioner to respond to that person's statement, "I am hungry," by repeating the original conditional statement. A reasonable officer in Agent Slater's position would have interpreted Alamilla-Hernandez's statement that he could not afford an attorney as an indication that Alamilla-Hernandez meets or satisfies the condition precedent that he could not afford a lawyer.

The court finds that Agent Slater's testimony that he understood Alamilla-Hernandez's statement to merely be an expression of his financial status borders on

disingenuous. In the context of the conversation, there would be no reason for Alamilla-Hernandez to make such a statement if not to express a desire for representation. Alamilla-Hernandez would not have told Agent Slater that he could not afford an attorney, which is the condition precedent required for appointment of an attorney, had he not wanted an attorney.

Agent Slater's rereading of the fourth sentence was not an appropriate response to the defendant's statement if the officer intended to clarify a miscommunication or misunderstanding. It seems to be an attempt to confuse the issues, if not "deliberately designed to circumvent *Miranda*." *Missouri v. Seibert*, 542 U.S. 600 (2004). If Agent Slater did not already interpret Alamilla-Hernandez's statement as a request for an attorney, then the expected, reasonable clarification would have been to ask the follow-up question, "Are you saying you want an attorney?". Instead of inquiring as to the meaning of Alamilla-Hernandez's statement, Agent Slater, who has a "working knowledge of the [Spanish] language," merely decided to reread verbatim the fourth sentence on the DEA 13A card.

The sequence of statements, as Agent Slater described, was as follows:

> Agent Slater: "If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish." (English translation).

Ex. 1.

> Alamilla-Hernandez: I cannot afford an attorney.

Tr. at 31.

> Agent Slater: "If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish." (English translation).

Ex. 1.

A reasonable defendant could also interpret an officer's repeating of the sentence as reassurance that the defendant would receive an attorney in due course, not that

11

questioning would be suspended until he consulted with an attorney. Equally as likely, especially with the language barrier and custodial nature of the questioning, the defendant could have understood the officer's repeated question to mean that the defendant had given the officer the wrong answer, the only correct answer being "yes" to this and all of the questions.

The magistrate judge cites *Davis v. United States*, 512 U.S. 452, 462 (1994), *United States v. Kelly*, 329 F.3d 624, 630 (8th Cir. 2003), and *Dormire v. Wilkinson*, 249 F.3d 801, 805 (8th Cir. 2001) to support his findings that Alamilla-Hernandez's statement was not a request for an attorney. However, Alamilla-Hernandez's case is distinguishable from those cases in many respects.

In *Davis*, the defendant had already been interviewed for an hour and a half, when he told agents, "Maybe I should talk to a lawyer." *Davis v. United States*, 512 U.S. 452, 462 (1994). The agents' response was to ask if the defendant wanted a lawyer and the defendant replied that he did not. *Id.* "They took a short break, he was reminded of his rights, and the interview continued for another hour. . . ." *Id.* Though the Supreme Court does not require follow-up questioning in every case, the Court recognized, "that requiring a clear assertion of the right to counsel might disadvantage some suspects who–because of fear, intimidation, lack of linguistic skills, or a variety of other reasons–will not clearly articulate their right to counsel although they actually want to have a lawyer present," and noted "it will often be good police practice for the interviewing officers to clarify whether or not [a defendant] actually wants an attorney. That was the procedure followed by the agents in this case." *Id*. "Clarifying questions help protect the rights of the suspect by ensuring that he gets an attorney if he wants one, and will minimize the chance of a

12

confession being suppressed due to subsequent judicial second-guessing as to the meaning of the suspect's statement regarding counsel." *Id.*  The Supreme Court holding in *Davis,* that the defendant's equivocal statement, after about ninety minutes of questioning, did not amount to a request for counsel was based on law enforcement's subsequent clarification of the statement.  *Id.* ("It was entirely proper for [the officers] to clarify whether petitioner in fact wanted a lawyer.")

Furthermore*,* both the interviewing agent and the defendant in *Davis* spoke English. However, in the case at hand, the defendant speaks no English and the interviewing agent is not fluent in Spanish.  Tr. at 4.  Also, Alamilla-Hernandez and Agent Slater speak different dialects of Spanish.  Tr. at 7.  Considering the circumstances of the case, the court finds a reasonable officer would interpret the defendant's statement to be a request for a lawyer.  Nonetheless, if Agent Slater were unsure about the defendant's wishes, Agent Slater should have at least asked a clarifying follow-up question.  The rereading of the fourth sentence does nothing to clarify the issue.  The fact that Agent Slater felt it necessary to repeat the sentence shows Agent Slater thought the defendant's statement needed to be clarified.  If it was "good police practice" and "entirely proper" for the agent in *Davis,* where both sides spoke English, to clarify whether the defendant's statement was a request for counsel*,* then it would have been even more appropriate, in this case, for Agent Slater to ask Alamilla-Hernandez if he wanted a lawyer, due to the linguistic differences that existed.

Additionally, both the timing and wording of Alamilla-Hernandez's statement are distinguishable from the defendant's statement in *Davis*.  In *Davis*, the defendant waited until after an hour and a half of questioning before stating, "Maybe I should talk to a

13

lawyer," whereas, Alamilla-Hernandez's statement occurred directly after the reading of his *Miranda* warnings, before the interview even started. Tr. at 10, *Davis v. United States*, 512 U.S. 452, 462 (1994). The defendant's statement in *Davis* contains unequivocal and ambiguous terms such as "maybe" and "should," however, Alamilla-Hernandez's statement is a clear and unambiguous statement of fact. *Id.* As previously discussed, when Alamilla-Hernandez said he could not afford an attorney, he asserted that he met the condition required to have a lawyer appointed to him, and that he therefore wanted a lawyer. Tr. at 10.

In *United States v. Kelly*, the defendant invoked his right to remain silent during a custodial interrogation and officers terminated the interview. *United States v. Kelly*, 329 F.3d 624, 630 (8th Cir. 2003). Shortly thereafter, the officers released the defendant from custody, and they did not reinitiate contact with the defendant. *Id.* The investigation continued, and almost eleven months after his initial arrest, a grand jury convened to consider indicting the defendant. *Id.* That same day, the defendant "inexplicably appeared" at police headquarters to discuss a subpoena duces tecum, that had never been served upon him because officers could not locate him. *Id.* An Assistant U.S. Attorney and a DEA agent invited the defendant into a conference room and explained that the unserved subpoena sought business records, not testimony. *Id.* The defendant voluntarily talked to the attorney and agent. *Id.* When the agent tried to read the defendant his *Miranda* warnings, he terminated the meeting and asked, "Do you know any good attorneys?" and left the office. *Id.* Ten days later, officers arrested the defendant, who was carrying $3,000 in cash. *Id.* After the arrest, while being transported, an agent

reread the defendant his *Miranda* rights. The defendant waived his rights, and in response to the agent's questions, made incriminating statements regarding the money. *Id.*

The defendant in *Kelly* argued that his later statements should have been suppressed because he terminated the meeting, which occurred ten days earlier, and asked if the agent "knew any good attorneys," thereby invoking his right to counsel. *Id.* The court found the defendant was "not subject to custodial interrogation" during the earlier meeting, and therefore, "was not entitled to the protections of *Miranda*." *Id.* The court found that even if the officers had been required to offer the protections of *Miranda*, the defendant's question, "Do you know any good attorneys?" was "not an unequivocal request for the assistance of counsel." *Id*.

In *Kelly*, the defendant's supposed invocation of his right to counsel was not relevant because it occurred in a voluntary, noncustodial setting. *United States v. Kelly,* 329 F.3d 624, 630 (8th Cir. 2003). In this case, the Spanish-speaking defendant, who had been in custody overnight, stated that he could not afford an attorney immediately before Agent Slater questioned him during custodial interrogation. Even if the defendant's question, in *Kelly*, had occurred during a custodial interrogation, it is qualitatively different from the statement involved here. In *Kelly*, the defendant's question, "Do you know any good attorneys?" called for an answer from the agent, whereas Alamilla-Hernandez's statement informed Agent Slater that he qualified for having an attorney appointed for him. *United States v. Kelly*, 329 F.3d 624, 630 (8th Cir. 2003).

In *Dormire v. Wilkinson*, an officer read the defendant the *Miranda* warnings upon arresting him, and then the officer transported the defendant to the sheriff's office. *Dormire v. Wilkinson*, 249 F.3d 801, 805 (8th Cir. 2001). At the office, the officer gave the

15

defendant the *Miranda* warnings from a written form, which the defendant read. *Id.* The defendant then asked the officer if he could call his girlfriend, and the officer said no. *Id.* Next, the defendant asked, "Could I call my lawyer?" and the officer said, "yes." *Id.* Then, the officer began to ask the defendant questions, and the defendant answered them. *Id.* The court held that the defendant's question, "Could I call my lawyer?" while in custody was not a clear and unambiguous request for counsel, and therefore the officer was not required to stop his interrogation. *Id.* Similar to the defendant in *Kelly,* the defendant in *Dormire* asked the officer a question after hearing the *Miranda* warnings. In contrast, the defendant here responded to the *Miranda* warnings by making an unequivocal statement, through which he notified Agent Slater that he wanted a lawyer.

The defendants' responses in *Davis* and *Dormire* are also distinguishable from the defendant's statement here in that they contain the words, "maybe," "should" and "could," which are inherently ambiguous. *Davis v. United States*, 512 U.S. 452, 462 (1994). *Dormire v. Wilkinson*, 249 F.3d 801, 805 (8th Cir. 2001). In *Davis*, the defendant indicates that he is unsure of what he wants by stating, "**Maybe I should** talk to a lawyer." (emphasis added). *Id.* Likewise, with regards to the defendant's question in *Dormire*, "**Could** I call my lawyer?", the court noted that a reasonable officer could have believed that the defendant was merely asking whether he had the right to call a lawyer, rather than actually requesting a lawyer. *Id.* Unlike the defendants in *Davis* and *Dormire*, the defendant here made a clear, affirmative statement, rather than asking the officer an ambiguous or equivocal question.

In the context of the wording of the fourth sentence, considering the nature of the exchange between Agent Slater and the defendant, the language barrier, and the

defendant's illiteracy, the court finds a reasonable officer in Agent Slater's position would have understood the defendant's statement to be a request for a lawyer. After considering the totality of the circumstances, the court finds that Alamilla-Hernandez requested an attorney and did not knowingly and voluntarily waive that right. The court finds that a reasonable officer would have understood Alamilla-Hernandez's statement, "I cannot afford an attorney," to invoke the right to counsel that had just been explained to him. The court finds that the continued questioning was improper and that the defendant's motion to suppress statements should be granted.

THEREFORE, IT IS ORDERED:

1. Defendant's motion to suppress evidence, Filing No. 23, is denied;

2. Defendant's motion to suppress statements, Filing No. 29, is granted;

3. Defendant's objections to the report and recommendation of the magistrate, Filing No. 42, are granted in part and overruled in part as set forth herein; and

4. The report and recommendation of the magistrate judge, Filing No. 39, is adopted in part and rejected in part as set forth herein.

DATED this 27th of July, 2009.

BY THE COURT:

**s/ Joseph F. Bataillon**
Chief United States District Judge

---

*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.